UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JARREN GENDREAU                          :
                                         :
          vs.                            :          Case No. 1:14-cv-00337
                                         :
JOSUE D. CANARIO,                        :
In his capacity as Chief of Police of    :
the Bristol Police Department; and the   :
Town of Bristol, Rhode Island            :
                                         :

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. STATEMENT OF FACTS

**1. The Regulatory Framework**

Rhode Island criminalizes the unlicensed public carry of a pistol or revolver. See R.I. Gen. Laws 1956 § 11-47-8(a)  ("... Every person violating the provision of this section shall, upon conviction, be punished by imprisonment for not less than one nor more than ten (10) years, or by a fine up to ten thousand dollars ($10,000), or both, . . . .") There is a two tiered licensing scheme in place to seek the requisite permit. The Attorney General, is empowered, at his discretion, under R.I. Gen. Laws § 11-47-18 to issue pistol permits ". . . upon a proper showing of need . . . ." In contrast to the permit available through the Attorney General, the General Laws provide in pertinent part that:

> The licensing authorities of any city or town shall, upon
> application of any person twenty-one (21) years of age or over
> having a bona fide residence or place of business within the city or
> town, or of any person twenty-one (21) years of age or over having
> a bona fide residence within the United States and a license or
> permit to carry a pistol or revolver concealed upon his or her

1

> person issued by the authorities of any other state or subdivision of
> the United States, issue a license or permit to the person to carry
> concealed upon his or her person a pistol or revolver everywhere
> within this state for four (4) years from date of issue, if it appears
> that the applicant has good reason to fear an injury to his or her
> person or property or has any other proper reason for carrying a
> pistol or revolver, and that he or she is a suitable person to be so
> licensed.

R.I. Gen Laws § 11-47-11(a).

In Rhode Island, firearms law is the exclusive providence of the State. The General

Assembly has expressly preempted the field. See R.I. Gen. Laws 1956 § 11-47-58  ("The control

of firearms, ammunition, or their component parts regarding their ownership, possession,

transportation, carrying, transfer, sale, purchase, purchase delay, licensing, registration, and

taxation shall rest solely with the state, except as otherwise provided in this chapter.")

In addition to the state statutory framework, Bristol itself has developed a "policy" to

guide the processing of CCW applications. SUF 10. After receiving a completed application,

along with a "non-refundable" payment of $100.00[1] the Bristol Police Department conducts a

background check that "may include a check of court records and other sources for pending

criminal cases, restraining orders and/or discrepancies in the applicant's background, including

prior history or mental illness." SUF 6, 8. According to the policy, "[t]he Town of Bristol will not

issue a pistol permit to any applicant who is prohibited from possessing or carrying a firearm

under any State of Federal Law (e.g (sic) 18 U.S. (sic) 922(g)) or pursuant to any court order."

SUF 7. After the background check is done, the Chief proceeds to consider a showing of need.

SUF 8. "If this initial check does not disqualify the applicant from obtaining a pistol permit, the

Town of Bristol shall review the application on an individual basis to determine whether there

has been proper showing of need, as required by the statute, and whether the applicant is

---

1   It is noteworthy that this fee is ultra vires and not authorized by the firearms act. See R.I. Gen Laws § 11-47-12.

qualified." *Id*. The Chief's Policy, in a section captioned "Proper Showing of Need" first explains

the approach taken to making a determination:

> In considering each individual application for a pistol permit, the Town of Bristol must determine whether or not the applicant has demonstrated a proper showing of need to carry a loaded firearm in public, and consider the individual's demonstration of skill and responsibility to safely carry and use a firearm in compliance with all State, Federal and local laws. Because a loaded, concealed firearm in untrained hands presents danger to the public and the applicant, the Town of Bristol must consider countervailing risks to the public in assessing need.

SUF 9. The policy then goes on to set out the "factors" considered in making the determination:

> While there cannot be any set formula or criteria to limit or restrict the Town of Bristol's discretion to issue or deny a concealed weapon license, the Town will afford a hearing to each applicant before ruling on the application. The Town of Bristol considers the following factors in assessing an applicant's proper showing of need.
>
> 1. Has the applicant demonstrated a specific articulable risk to life, limb or property? If so, has the applicant demonstrated how a pistol permit will decrease the risk?
>
> 2. Can the applicant readily alter his or her conduct, or undertake reasonable measures other than carrying a firearm, to decrease the danger to life, limb or property?
>
> 3. Are there means of protection available to the applicant other than the possession of a firearm that will alleviate the risk to his or her person or property?
>
> 4. Has the applicant demonstrated the skill, training and ability to properly use a firearm in accordance with Rhode Island laws?
>
> 5. Has the applicant presented a plan to properly secure the firearm so that it does not fall into unauthorized hands?
>
> 6. How greatly will the possession of a firearm by the applicant increase the risk of harm to the applicant or to the public?

7. Has the applicant demonstrated that he or she will not use the firearm for an unlawful or improper purpose, and that he or she has not used a firearm for n (sic) unlawful or improper purpose in the past?

8. Does past unlawful, dangerous or violent conduct of the applicant justify denial of the license by the Town even if it is not sufficient to disqualify the applicant as a matter of law from possessing a firearm?

9. Has a protective order been issued relative to the applicant pursuant to chapter 15-5, chapter 15-15, or chapter 8-8.1 of the general laws?

10. Are other factors deemed lawful and appropriate by the Town to demonstrate that the applicant is or is not a person suitable to possess a firearm in public.

SUF 10.

According to the policy, "[a]fter assessing the above factors, the Town shall grant or deny the concealed weapon permit, and in the case of a denial, shall state its reasons therefore in writing." SUF 11.

## 2. Defendant's Application of the Challenged Provisions Against the Petitioner

The petitioner followed the process laid out in the Bristol Policy and applied for a Concealed Carry Permit in the Spring of 2012. SUF 12. In his Application, Gendreau explained that he was seeking a permit for three reasons. SUF 13. First, Gendrau explained that he is a firearms collector with a collection, at the time, worth in excess of $4,000. SUF 13; Pl. Compl. Ex 3. Next Gendreau explained that he was employed as a security guard and was seeking expanded employment opportunities that only a concealed weapons permit (CCW) could provide, including those in Massachusetts which would require a further application and permit

4

as well. *Id*.  Finally, Gendreau explained that he often transports large sums of money, and that

he needs a CCW for personal protection and self-defense. *Id*.

In early May, the petitioner participated in an "interview" with a board appointed by the

Chief of Police to conduct the hearing called for by the Town's Policy. SUF 14. During the

interview Gendreau was asked about his reasons for desiring a permit and reiterated those

reasons contained in his letter. SUF 15. Of particular focus was Gendreau's desire to obtain a

Massachusetts permit, leading to the following colloquy:

> BOARD MEMBER 2: If they were to hire you in
> Massachusetts, for this position, that requires you to have a firearm
> and your a Rhode Island resident. Are they going to tell you, we're
> not going to hire you because you have to have a firearm, a
> concealed weapons permit but you first have to go get one from
> Rhode Island. I . . . does, when he said does it get around the issue?
> MR. GENDREAU: No, like I said, I after I apply to this I'm
> going to apply to the Massachusetts State Police, who issues their
> out of state, non-resident concealed to carry permits for class A
> LTCs as they call it there its not truly concealed carry.
> BOARD MEMBER 2: Are you saying Massachusetts,
> Massachusetts will not issue a permit to a non resident . . .
> MR. GENDREAU: Unless they have it in their home state.
> BOARD MEMBER 2: Even if you get hired?
> MR. GENDREAU: Even if you get hired, you must have it
> in your home state. yep that's necessary, mandatory, no ifs, ands or
> buts.
> BOARD MEMBER 2: (unintelligible) . . . ask the
> question.
> MR. GENDREAU: I'm sorry yeah.
> BOARD MEMBER 2: That's interesting because most, I
> would say this heavily weighs on need and if you have a need in
> Massachusetts and not a need  in Rhode Island how can they make
> you get one?
> MR. GENDREAU: Well it doesn't really weigh on need in
> Rhode Island for the town anyway, I believe it's 11-47-11 it doesn't
> say a showing of need, its says has a reason to believe they will,
> could be under great bodily harm which, for the reasons listed, I
> think its fair to say I fare reason to believe that during such
> activities I run the  risk great bodily harm and then its a shall issue.

> BOARD MEMBER 2: OK and you never read proper showing of need under that?
>
> MR. GENDREAU: That is under the AG which you guys are not, you are the town official which is 11-47-11. I'm pretty sure. I think your. . .

* * *

SUF 15.

After also focusing on the desire for expanded employment opportunities and a Massachusetts permit, another members asked for "an example when you would draw, draw a weapon?" to which Gendreau responded:

> Well do you want to give me a scenario or just an example. Well, I'd never draw a weapon unless one, I can't retreat; two I feel my life is threatened and in immediate physical harm and three, the fear I'm going to be killed. There is no other reason to draw a weapon, no brandishing, its all bad, unless you can't run and you fear for you life and that your going to die. There is no point to even drawing it besides under those situations.

SUF 16.

At no other time during the interview did anyone on the Board ever pose a question going to Gendreau's suitability. SUF 17; Pl.'s Compl. Ex. 3, p. 1-9. Gendreau has never been arrested, never been confined or treated for mental health, and never been indicted or charged with a criminal violation. SUF 18; Pl.'s Compl. Ex. 2. He had pled nolo contendre to a speeding violation in 2009. *Id*. Gendreau is a resident of Bristol, Rhode Island and over the age of 21. SUF 1, 19.

After going through the onerous application process, On June 26, 2012, the Chief sent a short two paragraph letter to the Petitioner stating in pertinent part:

> After carefully reviewing the application and receiving a recommendation from the panel which interviewed you with regards to your application for a concealed weapon permit, it is with regret that I advise you that I feel that you do not meet the criteria outlined in 11-47-11 of the General Laws of Rhode Island

6

as amended, as well as Bristol Police Department's Guidelines
which would justify me issuing you a concealed weapons permit.

SUF 23.

On or about February 25, 2013 plaintiff Gendreau filed a Petition for Certiorari with the Rhode Island Supreme Court seeking review of the decision denying his concealed carry permit application arguing, inter alia, that the decision denying the application was insufficiently detailed, and that it violated the petitioner's constitutional and statutory rights under the laws of the United States and the State of Rhode island. SUF 24. On September 18, 2013, the Rhode Island Supreme Court granted the plaintiff's petition for certiorari and quashed the original decision denying the plaintiff's concealed carry permit application. SUF 25. The order of the Rhode Island supreme court, allowed the defendants ninety days within which to render a new decision. The decision also granted the plaintiff leave to amend his petition for certiorari to include any disputes with the new decision without the need to file an additional petition for review or incur the cost of a filing fee for the new petition, if filed within thirty days of the new decision. SUF 26. After its decision was quashed, the defendants rendered a new decision again denying the plaintiff's application. SUF 27. Though dated October 16, 2013, the second letter was not actually sent to Plaintiff's counsel until November 21, more than 30 days after it was rendered. SUF 28.

## II. STATEMENT OF THE CASE

When individuals enjoy a constitutional right to engage in an activity, a license to engage in that activity cannot be conditioned on the government's determination of their "need" to exercise that right. Despite Rhode Island's clear statutory mandate to the contrary, and the constraints of Both

the Rhode Island and United States Constitutions, Defendant imposes this classic form of unconstitutional prior restraint against the fundamental individual right to keep and bear arms. He must be enjoined from doing so. Of course, Defendant has an interest in regulating firearms in the interest of public safety, just as Defendants have an interest in regulating the time, place, or manner of speech or public assemblies. Petitioner does not challenge the idea that the state may license the carrying of firearms, just as the state might license parades or demonstrations. But the regulatory interest here is not absolute. Whatever else the state may command with respect to the carrying of arms, it cannot reserve for itself the power to arbitrarily decide, in all cases, whether individuals should be able to carry guns for self-defense nor may one of its officers arbitrarily decide that an applicant for a permit who has complied with all requirements of the permitting application process and who has no disqualifying features should be denied simply because the officer does not "feel" the Petitioner is entitled to exercise his rights. That decision has already been made for the state, in the federal constitution, and for the Chief, in the Rhode Island General Laws.

## III. SUMMARY OF ARGUMENT

This case is not difficult. The Second Amendment secures a right to carry arms for self-defense. Defendants refuse to acknowledge that carrying arms is a right, and instead, contrary to both Rhode Island and Federal law, demand that applicant prove his need to do so.

There is no such thing as a "right" that can be denied unless people prove a special need to exercise it. Prior restraints on constitutionally-protected conduct cannot allow regulators unbridled discretion in choosing who may exercise the right, nor can regulators substitute their own judgment for that of the Constitution as to whether the exercise of a particular right is a good idea. Moreover, when a regulator refuses to issue a permit, basic principles of due process

and fundamental fairness dictate that the decision must be rational and supported by evidence. Here the challenged provision, or at least its implementation by Bristol officials, violates these basic prior restraint and due process standards. And because the challenged practice arbitrary classifies individuals in the exercise of a fundamental right, it also violates the Equal Protection Clause of both the Rhode Island and United States Constitutions.

## STANDARD OF REVIEW

Plaintiff Gendreau brings this motion pursuant to Rule 56 of the Federal Rules of Civil Procedure, which provides that summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When analyzing a motion for summary judgment the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *DeLia v. Verizon Commc'ns Inc.*, 656 F.3d 1, 3 (1st Cir. 2011). However, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Meuser v. Fed. Express Corp.*, 564 F.3d 507, 515 (1st Cir. 2009) (*quoting Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).

## ARGUMENT

A. BRISTOL'S DENIAL OF PETITIONER'S CONCEALED CARRY PERMIT APPLICATION VIOLATES PETITIONER'S FUNDAMENTAL RIGHT TO CARRY ARMS IN PUBLIC.

**1. The Second Amendment Secures a Fundamental Right to Carry Arms in Public.**

"[H]istorical meaning enjoys a privileged interpretative role in the Second Amendment context." *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) (citations omitted).

The first step in any Second Amendment case is to conduct an "historical inquiry seek[ing] to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). Answering whether an activity comes within the Amendment's protection "requires a textual and historical inquiry into original meaning." *Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011). The Second Amendment protects the fundamental right "to keep and bear arms." U.S. Const. amend. II. In the landmark case of *District of Columbia v. Heller*, 554 U.S. 570, 591 (2008), the United States Supreme Court was faced with the question of whether that protection extended an individual right to carry arms for self-defense or whether the right created was collective in nature, the Court rejected the argument that "keep and bear arms" was a unitary concept referring only to a right to possess weapons in the context of military duty. "At the time of the founding, as now, to 'bear' meant to 'carry.'" *Id.* at 584 (citations omitted). To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)); BLACK'S LAW DICTIONARY 214 (6th Ed. 1998)); "[B]ear arms means . . . simply the carrying of arms . . ." *Heller*, 554 U.S. at 589. Importantly the right protected by the Second Amendment is "an individual right protecting against both public and private violence." *Id.* at 594.

The syntax employed by the Second Amendment is not unique within the Bill of Rights. The Sixth Amendment guarantees the right to a "speedy and public trial," U.S. Const. amend. VI, while the Eighth Amendment secures individuals from "cruel and unusual" punishment. U.S. Const. amend. VIII. Just as the Sixth Amendment does not sanction secret, speedy trials or

public, slow trials, and the Eighth Amendment does not allow the usual practice of torture, the

Second Amendment's reference to "keep and bear" refers to two distinct concepts; a right to own

guns and a right to "carry" guns for self-defense. To "bear arms," as used in the Second

Amendment, is to "wear, bear, or carry . . . upon the person or in the  clothing or in a pocket, for

the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict

with another person." *Heller*, 554 U.S. at 584 (citation omitted); *People v. Yanna*, No. 304293,

2012 Mich. App. LEXIS 1269, at *11 (Mich. App. June 26, 2012) ("The Second Amendment

explicitly protects the right to 'carry' as well as the right to 'keep' arms." ); *United States v.*

*Weaver*, No. 2:09-CR-00222, 2012 U.S. Dist. LEXIS 29613, at *13 (S.D.W. Va. Mar. 7, 2012)

(citation and footnote omitted) ("[T]he Second Amendment, as historically understood at the

time of ratification, was not limited to the home.").

  Heller's dissenters also acknowledged that the decision protected the public carrying of

arms:

> Given the presumption that most citizens are law abiding, and the
> reality that the need to defend oneself may suddenly arise in a host
> of locations outside the home, I fear that the District's policy
> choice may well be just the first of an unknown number of
> dominoes to be knocked off the table.

*Heller*, 554 U.S. at 680 (Stevens, J., dissenting).

  In upholding the right to carry a handgun under the Second Amendment, Heller broke no

new ground. As early as 1846, Georgia's Supreme Court, applying the Second Amendment,

quashed an indictment for the carrying of a handgun that failed to allege whether the handgun

was being carried in a constitutionally-protected manner. *Nunn v. State*, 1 Ga. 243, 251 (1846);

*see also In re Brickey*, 8 Idaho 597, 70 P. 609 (1902) (Second Amendment right to carry

handgun). Numerous state constitutional right to arms provisions - including our own - have

likewise been interpreted as securing the right to carry a gun in public, albeit often, to be sure, subject to some regulation. *See, e.g. Mosby,* 851 A. 2d at 1042*; Kellogg v. City of Gary*, 562 N.E.2d 685 (Ind. 1990); *State ex rel. City of Princeton v. Buckner*, 180 W. Va. 457, 377 S.E.2d 139 (1988); *City of Las Vegas v. Moberg*, 82 N.M. 626, 485 P.2d 737 (N.M. Ct. App. 1971); *State v. Rosenthal*, 75 Vt. 295, 55 A. 610 (1903) (striking down ban on concealed carry); *Andrews v. State*, 50 Tenn. 165 (1871); see also *State v. Delgado*, 298 Or. 395, 692 P.2d 610 (Or. 1984) (right to carry a switchblade knife).

Moreover, the right to bear arms is not abrogated by recognition of the fact it may be regulated. To the contrary, precedent approving of the government's ability to regulate the carrying of handguns confirms the general rule to which it establishes exceptions. For example, traditionally, "the right of the people to keep and bear arms (Article 2) is not infringed by laws prohibiting the carrying of concealed weapons . . . ." *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897) (emphasis added). Recounting Heller's imposition of the common-use test to delineate between arms that are protected and unprotected by the Second Amendment, the Fourth Circuit observed, "The Court found support for this limitation in ''the historical tradition of prohibiting the carrying of dangerous and unusual weapons.' Thus, a citizen's right to carry or keep sawed-off shotguns, for instance, would not come within the ambit of the Second Amendment." *Chester*, 628 F.3d at 679 (citations omitted).

The recent U.S. Supreme Court decisions have likewise suggested that such bans are only "presumptively" constitutional and subject to invalidation by judicial review. *Heller*, 128 S. Ct. at 2817 n.26 (emphasis added). For example, surveying the history of concealed carry prohibitions, it appears time and again that such laws have been upheld as mere regulations of

the manner in which arms are carried – with the understanding that a complete ban on the carrying of handguns is unconstitutional.

*Heller* discussed, with approval, four state supreme court opinions that referenced this conditional rule. See *Heller*, 128 S. Ct. at 2818 (discussing *Nunn*, supra, 1 Ga. 243; *Andrews*, supra, 50 Tenn. 165; and *State v. Reid*, 1 Ala. 612, 616-17 (1840)) and 128 S. Ct. at 2809 (citing *State v. Chandler*, 5 La. Ann. 489, 490 (1850)). In *Reid*, upholding a ban on the carrying of concealed weapons, Alabama's high court explained:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional. But a law which is merely intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution.

*Reid*, 1 Ala. at 616-17.

The *Nunn* court followed *Reid*, and quashed an indictment for publicly carrying a pistol for failing to specify how the weapon was carried:

> so far as the act . . . seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of selfdefence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void.

*Nunn*, 1 Ga. at 251 (emphasis original).

*Andrews* presaged *Heller* by finding that a revolver was a protected arm under the state constitution's Second Amendment analog. It therefore struck down as unconstitutional the application of a ban on the carrying of weapons to a man carrying a revolver, declaring:

> If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence. We only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Andrews*, 165 Tenn. at 187-88.[2]

Finally, in *Chandler*, the Louisiana Supreme Court held that citizens had a right to carry arms openly:

> "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

*Heller*, 554 U.S. at 613 (quoting *Chandler*, 5 La. Ann. at 490).

The legal treatises relied upon by the Heller court explained the rule succinctly. Supporting the notion that concealed carrying may be banned, *Heller* further cites to THE AMERICAN STUDENTS' BLACKSTONE, 84 n.11 (G. Chase ed. 1884). *Heller*, 544 U.S. at 626. That source provides:

> [I]t is generally held that statutes prohibiting the carrying of concealed weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to

---

2       Andrews appeared to abrogate in large part *Aymette v. State*, 21 Tenn. 154 (1840), upholding the prohibition on the concealed carry of daggers. But even *Aymette*, which found a state right to bear arms limited by a military purpose, deduced from that interpretation that the right to bear arms protected the open carrying of arms. *Aymette*, 21 Tenn. at 160-61.

> public or personal defence. In some States, however, a contrary
> doctrine is maintained.

AMERICAN STUDENTS' BLACKSTONE, 84 n.11 (emphasis original).

Indeed, Rhode Island is one such jurisdiction where the General Assembly has made the policy choice to require that those exercising a right to carry, do so in a concealed manner. Yet despite the flexibility afforded the states to regulate for time place and manner, the Blackstone understanding survives. See, e.g. *In re Application of McIntyre*, 552 A.2d 500, 501 n.1 (Del. Super. 1988) ("[T]he right to keep and bear arms' does not of necessity require that such arms may be kept concealed."). It is important, then, to recall that the United States Supreme Court's definition of "bear arms" as that language is used in the Second Amendment includes the concealed carrying of handguns: "wear, bear, or carry . . . in the clothing or in a pocket . . ." Heller, 554 U.S. at 584 (citations omitted) and the cases supporting concealed carry prohibitions explain that no abrogation of the right to carry arms is effected because open carrying is still permitted in those jurisdictions. The sum total of the precedent is clear: a state may reasonably regulate the time, place and manner of carrying guns, but cannot completely abrogate the right.

**2. The Substantial and Probative Evidence of the Record Establishes that the Defendant was Required to Issue a Permit to the Petitioner under Article 1, § 22 of the Rhode Island Constitution and Rhode Island General Law § 11-47-11(a).**

In *Mosby v. Devine*, 851 A.2d at 1031, the Rhode Island Supreme Court had occasion to consider the rights secured by Article 1, Sec. 22 of the Constitution of the State of Rhode Island and Providence Plantations. The *Mosby* Court was called upon to consider whether an applicant could appeal the denial of an Attorney General's carry permit under § 11-47-18, pursuant to the Rhode Island Administrative Procedures Act ("APA") §§ 42-35 et. seq. *Id.* In concluding that the APA did not control a licensing determination under § 11-47-18, the court explained that

"[t]wo separate and distinct licensing procedures are set forth in the Firearms Act: § 11-47-18 . . . provides for the discretionary grant of a firearms license . . . and § 11-47-11(a), a mandatory licensing provision that provides in pertinent part:

The licensing authorities of *any* city or town *shall,* upon application of any person twenty-one (21) years of age or over having a bona fide residence or place of business within the city or town, or of any person twenty-one (21) years of age or over having a bona fide residence within the United States and a license or permit to carry a pistol or revolver concealed upon his or her person issued by the authorities of any other state or subdivision of the United States, issue a license or permit to the person to carry concealed upon his or her person a pistol or revolver everywhere within this state for four (4) years from date of issue, if it appears that the applicant has good reason to fear an injury to his or her person or property or has any other proper reason for carrying a pistol or revolver, and that he or she is a suitable person to be so licensed."

Id. at 1047 (emphasis added).

Because R.I. Gen Laws 1956 § 11-47-18 was an alternate route to licensure that vested complete discretion in the Attorney General, a determination under that section did not implicate the constitutional carry rights of citizens and issuance under that section was not controlled by the APA. However, the court explained, "[i]n contrast to § 11-47-18, the statute now before the Court, § 11-47-11 is mandatory — an applicant who meets the criteria set forth in § 11-47-11 is entitled to a gun permit. (Citing *Schubert v. DeBard,* 398 N.E.2d 1339, 1341 (Ind.Ct.App.1980) ("[I]f it is determined . . . that the applicant has met the conditions of the statute, the [licensing authority] has no discretion to withhold the license.")).

The Mosby court continued its analysis by explaining that the Rhode Island State constitutional guarantee to keep and bear arms is "fulfilled" by the mandatory licensing statute. *Id.* at 1048 ("Because anyone who meets the conditions of § 11-47-11 is entitled to a gun permit, this mandatory requirement supplies the necessary safeguards to the right

to bear arms in this state and vindicates the rights set forth in art. 1, sec. 22, of the Rhode

Island Constitution.") Though decided before the United States Supreme Court's decisions

in *Heller*, because a right cannot be secured by the arbitrary discretion afforded the Attorney

General under § 11-47-18, it is clear Rhode Island's "shall issue" permit statute must also serve

as the mechanism through which law abiding citizens are able to exercise their rights under the

Second Amendment and that failure to recognize and respect those rights constitutes a violation

of Article I, § 22 of the Rhode Island State Constitution, as well as a violation of the Second

Amendment.

Recently, Gadomski, v. Tavares, __ A.3d __ (R.I. 2015) (Docket No. 2014-72-M.P. Filed

April 22, 2015) the Rhode Island Supreme Court reaffirmed the Mosby holding that the Firearms

Act's mandatory provisions require an official presented with an application under R.I. Gen.

Laws 1956 § 11-47-11(a)  to issue a permit upon satisfaction of the statute's two criteria: that the

applicant's reason for seeking a permit is "proper" and that the applicant is not "unsuitable."[3]


### i. Gendreau satisfied § 11-47-11(a)'s suitability requirement.

When considering an applicant's suitability, there is near universal agreement that certain

categories render an applicant per se unsuitable. "The finding that an applicant is a suitable

person involves an exercise of discretion, but certain individuals are unsuitable as a matter of

law, including convicted felons, habitual drunkards, mental incompetents, illegal aliens, and

anyone who has failed to meet the minimum firing qualification score." *Mosby*, 851 A.2d  at

1047-48; Hightower v. City of Boston, 693 F.3d 78-79 (1st Cir. 2012); *Kuck v. Danaher*, 822 F.

Supp. 2d 109, 128-129 (D. Conn. 2011).

---

[3]   The Gadomski court also identified a third criterion, age and residency, both of which are satisfied by Gendreau.
See Compl. Ex. 2 Plaintiff's Application for a concealed carry permit.

Beyond the per se unsuitable categories, it is clear the permitting officials are veiled with a certain degree of discretion to reject as unsuitable an applicant who poses a danger to the public or who impedes the ability of the official to conduct a fair evaluation of that individual's dangerousness. *See Gadomski*, __ A.3d __ (explaining that "[i]n Mosby, 851 A.2d at 1047-48, we identified the key discretionary component of § 11-47-11 as the determination of whether an applicant has met the suitability requirement"); See also *Hightower*, 693 F. 3d at 75 (failure to truthfully answer the questions on a permit application constitutes valid reason to deny a permit)[4]; *Huddleston v. United States*, 415 U.S. 814, 825 (1974) (federal prohibition on providing material false information to a licensed dealer in connection with the acquisition of firearms constitutional). Yet as the Rhode Island Supreme Court has emphasized in the past, that discretion is not, and may not constitutionally, be carte blanche to decide who may exercise their constitutional rights. *Mosby*, 851 A.2d at 1051. Other courts to consider the suitability requirement have likewise found limits on the scope of an administrative suitability determination. For example, faced with a facial challenge to Connecticut's suitability requirement, the Court in *Kuck* explained that the restriction was not unconstitutionally vague or overbroad because the requirement had traditionally been interpreted to require that the applicant must pose some appreciable danger to the public and that the determination be based on evidence. 822 F. Supp. 2nd 109, 128-129. While this is most likely to occur in instances where individuals have a record of lawless or criminal behavior, it is conceivable that a finding of unsuitability might be premised upon discovery of evidence that an applicant had been banned

---

4   Rhode Island already criminalizes the provision of false information in connection with a firearms license application see § 11-47-23  False information in securing firearm or license providing  ("[n]o person shall, in purchasing or otherwise securing delivery of a shotgun, rifle, pistol, or revolver, or in applying for a license to carry it, give false information or offer false evidence of his or her identity. Violation of the provisions of this section may be punished by imprisonment for not more than five (5) years.")

from a shooting range for repeated failure to follow safety protocols, particularly if that fact were combined with some other evidence of continuing erratic, unsafe, or uncontrollable behavior.

While all of these may pose interesting questions for future cases, in the instant matter, the Court need not delve into this particular thicket because it is clear based on Bristol's Policy, given that he was granted an interview, that there is no question as to Gendreau's suitability. SUF 14. Moreover the transcript and audio recording of the interview reveals the absence of any fact that any rational fact-finder or administrative actor could rationally conclude casts doubt on Gendreau's suitability. SUF 14, 15, 16, 17.  This is confirmed by the fact that nothing in either of the Chief's denial letters suggests a decision premised on Gendreau's unsuitability. SUF 20. As in Mosby, in which the Court's only mention of the suitability requirement was the observation that, "there is no suggestion that he is an unsuitable person" so too here is there no suggestion that the petitioner is unsuitable to carry a concealed firearm for self-defense. *Id*. Gendreau's application reveals he is a model citizen of exactly the sort we as a society would want to entrust with a firearm. Gendreau has never been arrested, never been confined or treated for mental health, never been indicted or charged with a criminal violation, and willingly disclosed a plea of nolo-contendre to a speeding violation in 2009. SUF 18. Nothing in either of the Chief's denial letters suggests otherwise. On this record, it is impossible to see how a determination that Gendreau was unsuitable could be sustained as rational. "Although we are mindful that the 'suitable person' provision in § 11-47-11 vests the local licensing authority with discretion to reject an application filed by an unsuitable person, this leeway does not affect the requirement that the licensing authority *shall* issue a permit to a suitable person who meets the requirements set forth in the statute." *Mosby*, 851 A.2d  at 1047-48.  Instead, the Chief's denials appear to reject Gendreau's application in the first instance, on the basis of his "feel[ings]" that Gendreau

failed to satisfy the criteria and in the second decision letter, on the basis of the Chief's implicit rejection of Gendreau's reasons; self-defense, expanded employment opportunities, and collector status.

### ii. Gendreau satisfies any proper reason requirement contained in §11-47-11(a).

Perhaps the most important indication of the Rhode Island Supreme Court's understanding of the legislative intent behind 11-47-11(a)'s "proper reason" requirement, is the text of *Mosby* and *Gadomski* itself. In *Mosby*, the only discussion of the applicant's reason for wanting a permit was the court's observation that as "[a]n avid gun collector, plaintiff has a proper reason for carrying a pistol or revolver" Id. at 1147. Similarly, in *Gadomski*, the applicant sought a permit "because he occasionally works alone handling cash and expensive tools and equipment, carries cash when purchasing firearms for his collection, and because he camps, hikes, and bikes alone." __ A.3d at __. Further, Gadomski also sought a permit "from this state, in which he resides, so that he could obtain a nonresident license from Massachusetts." *Id.* Again citing Mosby, the Gadomski court found that the applicant may have "proffered at least one proper reason under the statute," *Gadomski*, __ A.3d at __, n. 5. Notably, this suggests that Rhode Island Supreme Court has adopted a broad view of the proper reason prong. The court was wise to do so. Though Mosby was decided before the United States Supreme Court's decision in Heller, the Heller and McDonald decisions, combined with commonly accepted principles of constitutional avoidance reveal the Mosby Court's decision to interpret the proper reason prong in as broad a fashion as possible to be one not only of sound interpretation, but prescient in preserving the statute from constitutional attack. Unfortunately, Bristol's decision denying the petitioner's application adheres neither to the text and spirit of the Firearms Act as interpreted by *Mosby* and *Gadomski*, nor to the basic tenets of due process.

**3. The 14ᵗʰ Amendment prohibits government officials from arbitrarily determining whether an individual may exercise Second Amendment Rights, which are fundamental.**

    *a.  Requiring a "Good" or "Proper" Reason to Exercise a Fundamental Right Destroys the Right's Very Nature.*

This case can be resolved by recalling first principles. The concept of a "right" is simply not compatible with Defendants' licensing requirements for the act of carrying a handgun for self-defense. Traditionally, a "right" in the relevant sense was understood— and remains understood—as follows:

> As a noun, and taken in the concrete sense, a right signifies a power, privilege, faculty or demand, inherent in one person and incident upon another. "Rights" are defined generally as "powers of free action." And the primal rights pertaining to men are undoubtedly enjoyed by human beings purely as such, being grounded in personality, and existing anecdotally to their recognition by positive law.

Henry Campbell Black, A Dictionary of Law 1044 (1891).

A "right" to do something only when the police determine one has a "good" or "proper" reason to do it, is not much of a right. People would scoff at "rights" to due process, or against unreasonable searches and seizures, only when the police chief agrees that someone has an unusually "good" or "proper" reason to enjoy those rights. It is incredibly simple to construct public safety arguments against these (and any other) rights. Perhaps in a future constitutional convention, the people of the United States might determine that Fourth and Fifth Amendments' costs outweigh their benefits. But for now, the police chief's personal opinion about someone's "good" or "proper" reason to demand a warrant is not a factor in determining the applicability of Fourth Amendment rights, and the prosecutor's strong belief in the desirability of a conviction does not determine what process is "due."

The right to bear arms is no different. So long as there is no reason to bar someone from carrying a handgun, the police chief's opinion about the wisdom of this right is unimportant. Restricting the right to carry handguns only to those with a "good" or "proper" reason destroys the Second Amendment right. Defendants' licensing regime presumes that people are not entitled to carry guns, and burdens applicants with the task of proving the social value of their right. But "a constitutional prohibition cannot be transgressed indirectly by the creation of a statutory presumption any more than it can be violated by direct enactment. The power to create presumptions is not a means of escape from constitutional restrictions." *Speiser v. Randall*, 357 U.S. 513, 526 (1958) (citation omitted).

Moreover, constitutional rights are enjoyed by "the people." See U.S. Const. amend. II ("right of the people); U.S. Const. amend. I (same); U.S. Const. amend. IV (same); U.S. Const. amend. IX ("rights . . . retained by the people"). "[T]he term ['the people'] unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580.

> "[T]he people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

*Id*. (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). Thus, a right cannot be something enjoyed only by people with a "good reason to fear an injury to his or her person or property." RI Gen. Laws § 11-47-11(a). If bearing arms is "a right of the people," it cannot possibly be denied to the general community absent a "good reason." Nor is the right purchased with the carriage of cash or valuables. The interest in self-defense is, after all, primarily an interest in defending human life, not material wealth.

At least two courts have struck down this level of licensing discretion as being incompatible with a right to bear arms. *Schubert v. De Bard*, 398 N.E.2d 1339 (Ind. App. 1980); *People v. Zerillo*, 219 Mich. 635, 189 N.W. 927 (1922). A third, Rhode Island's Supreme Court in Mosby, has recognized, albeit in dicta, that such a licensing scheme would be unconstitutional. 851 A.2d at 1031.[5]

In *Schubert*, the Indiana Court of Appeals rejected a licensing official's claim that a statutory "proper reason" requirement allowed him to reject handgun carry license applications for an applicant's insufficient self-defense interest. The court rejected the notion that the licensing official had "the power and duty to subjectively evaluate an assignment of 'selfdefense' as a reason for desiring a license and the ability to grant or deny the license upon the basis of whether the applicant 'needed' to defend himself." *Schubert*, 398 N.E.2d at 1341.

> Such an approach contravenes the essential nature of the constitutional guarantee. It would supplant a right with a mere administrative privilege which might be withheld simply on the basis that such matters as the use of firearms are better left to the organized military and police forces even where defense of the individual citizen is involved.

Id. (footnote omitted).

Similarly in *Zerillo*, Michigan's Supreme Court struck down a statute prohibiting aliens from possessing revolvers without their Sheriff's consent. There, too, the licensing discretion was viewed as a destruction of a constitutional right to bear arms. "The exercise of a right guaranteed by the Constitution cannot be made subject to the will of the sheriff. The part of the

---

[5] It should also be noted that a fourth court, *Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014) had also found such a level of discretion to violate the guarantees of the Second Amendment. That decision is currently under en banc review and was argued in June of 2015. Per order of the Ninth Circuit, *Peruta* may not be cited as precedential within that jurisdiction until such time as the panel decision is rendered. Although at least three other courts have upheld "may issue" licensing schemes, one of these agreed with Plaintiffs' essential point that such a scheme is incompatible with the right's existence. Compare *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) (may issue scheme is evidence that right was unknown) and *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) (right to carry assumed); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) (same).

act under which the prosecution was planted is not one of regulation but is one of prohibition and

confiscation." Zerillo, 219 Mich. at 639, 189 N.W. at 928. "The [provision] making it a crime for

an unnaturalized, foreign-born resident to possess a revolver, unless so permitted by the sheriff,

contravenes the guaranty of such right in the Constitution of the State and is void." Id. at 642,

189 N.W.2d at 928.

The Third Circuit's opinion upholding such a licensing regime is also instructive. Drake

reasoned that 1913 and 1924 state laws mirroring Defendants' practice are "longstanding" and

thus evidence that the carrying of handguns itself falls outside the Second Amendment's scope.

Drake, 724 F.3d at 433-34. Of course, Drake cannot be right on this point. "Constitutional rights

are enshrined with the scope they were understood to have when the people adopted them,

whether or not future legislatures or (yes) even future judges think that scope too broad." Heller,

554 U.S. at 634-35. But Drake is essentially correct in acknowledging that a "justifiable need"

licensing standard is not compatible with the concept of a right.

### b. *The Other proper reason requirement, as applied by Defendant Canario and contained in the Bristol Policy constitutes an unlawful prior restraint.*

"*Heller* left open the issue of the standard of review, rejecting only rational-basis review."

*Chester*, 628 F.3d at 680. Notwithstanding the lack of resort to means-end scrutiny, *Heller*, as did

the D.C. Circuit before it, struck down Washington, D.C.'s functional firearms ban for

conflicting with the Second Amendment's core self-defense interest, and struck down the city's

handgun ban as barring a category of protected arms. As with other rights, means-ends scrutiny

is thus not the exclusive method for evaluating Second Amendment claims where more precise

tests are available. Such is the case here. Because the practice of bearing arms is secured by

Article 22 and the Second Amendment, the decision to issue a license to bear arms cannot be left

to the government's unbridled discretion.

> It is settled by a long line of recent decisions of this Court that an
> ordinance which . . . makes the peaceful enjoyment of freedoms
> which the Constitution guarantees contingent upon the
> uncontrolled will of an official -- as by requiring a permit or
> license which may be granted or withheld in the discretion of such
> official -- is an unconstitutional censorship or prior restraint upon
> the enjoyment of those freedoms.

*Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (citations omitted); see also F*W/PBS v. City of*

*Dallas*, 493 U.S. 215, 226 (1990) (plurality opinion); *Shuttlesworth v. Birmingham*, 394 U.S.

147, 151 (1969).

Courts have long analogized speech and gun rights. *Commonwealth v. Blanding*, 20

Mass. 304, 314 (1825); *Republica v. Oswald*, 1 U.S. (1 Dall.) 319, 330 n.* (Pa. 1788). It is,

unsurprising then, that Courts faced with second amendment challenges have often turned to

First Amendment jurisprudence to develop the analytical framework within which to evaluate

those claims.

> Because Heller is the first Supreme Court case addressing the
> scope of the individual right to bear arms, we look to other
> constitutional areas for guidance in evaluating Second Amendment
> challenges. We think the First Amendment is the natural choice.
> Heller itself repeatedly invokes the First Amendment in
> establishing principles governing the Second Amendment. We
> think this implies the structure of First Amendment doctrine should
> inform our analysis of the Second Amendment.

*Marzzarella*, 614 F.3d at 89 n.4; See also *Ezell*, 651 F.3d at 703 & 708.

The law of prior restraint, well-developed in the First Amendment context, supplies

useful guidance here. "We agree with those who advocate looking to the First Amendment as a

guide in developing a standard of review for the Second Amendment." *Chester*, 628 F.3d at 682

(citing *United States v. Marzzarella*, 614 F.3d 85, 89 n.4 (3d Cir. 2010) ("the structure of First

Amendment doctrine should inform our analysis of the Second Amendment") (other citation

omitted); see also *Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007), aff'd sub

nom *Heller* ("The protections of the Second Amendment are subject to the same sort of

reasonable restrictions that have been recognized as limiting, for instance, the First

Amendment.") (citation omitted). This is especially so, considering that in *Staub* and its progeny,

the Supreme Court did not limit its disapproval of prior restraints to First Amendment freedoms,

but spoke more generally of "freedoms which the Constitution guarantees." *Staub*, 355 U.S. at

322. As discussed infra, *Heller* itself summarily applied established prior restraint principles in a

Second Amendment context.

 In *Staub*, the Supreme Court struck down an ordinance authorizing a mayor and city

council "uncontrolled discretion," *Staub*, 355 U.S. at 325, to grant or refuse a permit required for

soliciting memberships in organizations. Such a permit, held the Court,

> makes enjoyment of speech contingent upon the will of the Mayor
> and Council of the City, although that fundamental right is made
> free from congressional abridgment by the First Amendment and is
> protected by the Fourteenth from invasion by state action. For
> these reasons, the ordinance, on its face, imposes an
> unconstitutional prior restraint upon the enjoyment of First
> Amendment freedoms and lays "a forbidden burden upon the
> exercise of liberty protected by the Constitution."

*Staub*, 355 U.S. at 325 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 307 (1940)); see also

*Largent v. Texas*, 318 U.S. 418, 422 (1943) (striking down ordinance allowing speech permit

where mayor "deems it proper or advisable."); *Louisiana v. United States*, 380 U.S. 145, 153

(1965) ("The cherished right of people in a country like ours to vote cannot be obliterated by the

use of laws . . . which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar.").

"Traditionally, unconstitutional prior restraints are found in the context of judicial injunctions or a licensing scheme that places 'unbridled discretion in the hands of a government official or agency.'" *Nat'l Fed'n of the Blind v. FTC*, 420 F.3d 331, 350 n. 8 (4th Cir. 2005) (quoting *FW/PBS*, 493 U.S. at 225-26). "Unbridled discretion naturally exists when a licensing scheme does not impose adequate standards to guide the licensor's discretion." *Chesapeake B & M, Inc. v. Harford County*, 58 F.3d 1005, 1009 (4th Cir. 1995) (en banc); cf. *Green v. City of Raleigh*, 523 F.3d 293, 306 (4th Cir. 2008) ("'virtually unbridled and absolute power' to deny permission to demonstrate publically(sic), or otherwise arbitrarily impose de facto burdens on public speech" is unconstitutional) (citation omitted).

In the First Amendment context, the presumption against prior restraints is not aimed exclusively at preventing content-based decision-making. "[W]hether or not the review is based upon content, a prior restraint arises where administrative discretion involves judgment over and beyond applying classifying definitions." *Mom N Pops, Inc. v. City of Charlotte*, 979 F. Supp. 372, 387 (W.D.N.C. 1997) (citations omitted); *Beal v. Stern*, 184 F.3 117, 124 (2d Cir. 1999). The presumption against prior restraints is in part based on "a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558-59 (1975) (citations omitted).

Accordingly, standards governing prior restraints must be "narrow, objective and definite." *Shuttlesworth*, 394 U.S. at 151. Standards involving "appraisal of facts, the exercise of

judgment, [or] the formation of an opinion" are unacceptable. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (quoting *Cantwell*, 310 U.S. at 305).

Public safety is invoked to justify most laws, but where a fundamental right is concerned, a mere incantation of a public safety rationale does not save arbitrary licensing schemes. In the First Amendment arena, where the concept has been developed extensively,

> [W]e have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places . . . There are appropriate public remedies to protect the peace and order of the community if appellant's speeches should result in disorder or violence.

*Kunz v. New York*, 340 U.S. 290, 294 (1951); *Shuttlesworth*, 394 U.S. at 153. "But uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right." *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 516 (1937) (plurality opinion).

> Even when the use of its public streets and sidewalks is involved, therefore, a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade, according to their own opinions regarding the potential effect of the activity in question on the "welfare," "decency," or "morals" of the community.

*Shuttlesworth*, 394 U.S. at 153.

Typical of the types of licensing schemes striken under these principles was a Baltimore ordinance that prohibited permits for public assembly "unless the [applicant] person, club, association or corporation is deemed fit, responsible and proper to receive same, by the chief of police." *Norton v. Ensor*, 269 F. Supp. 533, 537 (D. Md. 1967).

For an example of these prior restraint principles applied in the Second Amendment context, the Court need look no further than *Heller* itself. Although the case is best known for its

challenges to a direct handgun ban and a functional firearms ban, *Heller* also challenged

application of a third law, for functioning as an indirect handgun ban: the District of Columbia's

requirement that handgun registrants obtain a discretionary (but never issued) permit to carry a

gun inside the home. *Heller*, 570 U.S. at 572. The Supreme Court held that the city had no

discretion to refuse issuance of the permit: "Assuming that Heller is not disqualified from the

exercise of Second Amendment rights, the District must permit him to register his handgun and

must issue him a license to carry it in the home." *Id*. In other words, the city could deny Heller a

permit if it could demonstrate there was some constitutionally valid reason for denying him

Second Amendment rights. But the city could not otherwise refuse to issue the permit. The city

repealed its home carry permit requirement.

　　The same logic governs this case. In addition to violating the Firearms Act's two tiered

licensing scheme by claiming for itself the discretion vested only with the Attorney General,

Bristol's insistence that applicants demonstrate a "proper showing of need" fails constitutional

scrutiny as an impermissible prior restraint. The right to carry a firearm for self-defense is plainly

among the "freedoms which the Constitution guarantees." *Staub*, 355 U.S. at 322. Accordingly,

the government bears the burden of proving that an applicant may not have a permit, for some

constitutionally-compelling reason defined by application of standards that are "narrow,

objective and definite." *Shuttlesworth*, 394 U.S. at 151; See also *Board of Regents of State*

*Colleges v. Roth*, 408 U.S. 564, 569-71 (1972) (internal citation omitted) ("to determine whether

due process requirements apply in the first place, we must look not to the 'weight' but to the

nature of the interest at stake. We must look to see if the interest is within the Fourteenth

Amendment's protection of liberty and property").

The same analysis is likewise compelled by the equal protection clause. The Second

Amendment secures a fundamental right. *McDonald*, 130 S. Ct. at 3042 (plurality opinion) &

3059 (Thomas, J., concurring). "[C]lassifications affecting fundamental rights are given the most

exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). Under this

analysis, the government carries the burden of proving the law "furthers a compelling interest

and is narrowly tailored to achieve that interest," *Citizens United v. FEC*, 130 S. Ct. 876, 898

(2010) (citation omitted), a burden that cannot be met where less restrictive alternatives are

available to achieve the same purpose. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004); see also

*United States v. Engstrum*, 609 F. Supp. 2d 1227, 1331-32 (D. Utah 2009) (applying strict

scrutiny in Second Amendment analysis).

"The right to equal protection of the laws, in the exercise of those freedoms of speech and

religion protected by the First and Fourteenth Amendments, has a firmer foundation than the

whims or personal opinions of a local governing body." *Niemotko v. Maryland*, 340 U.S. 268,

272 (1951). Likewise, with the exercise of fundamental Second Amendment freedoms.

Unless construed to mean merely that an applicant wishes to exercise his or her

constitutional right to keep and bear arms for self defense and does so without an improper

purpose – that is to say, without intending to employ the firearm in the commission of a crime,

the determination that Gendreau, or others, do not have a "need" for wanting to exercise their

constitutional rights is insufficient to deprive individuals of this important right. Indeed, in the

absence of the broadest possible reading of the proper reason requirement suggested by *Mosby*

and reinforced by *Gadomski*, the utter lack of legislatively proscribed standards utilized in

making this determination means that an applicant's right is subject to evaluation criteria that are

plainly not narrow, objective, or definite. Moreover, under the doctrine of constitutional

avoidance, the ordinary rule that statutes are to be read to avoid serious constitutional doubts, if

that course is possible, *Jones v. United States,* 529 U.S. 848, 857 (2000), and here it is readily

possible. See e.g. *Kuck v. Danaher*, 822 F. Supp. 2D 109, 128 (D. Ct. 2011) ("although the term

"suitable" as used in Section 29-28(b) is not statutorily defined, Connecticut courts have made

clear that the purpose of imposing a suitability requirement is to ensure that persons who

potentially would pose a danger to the public if entrusted with a handgun do not receive a

permit.")

Here, despite the plain statutory language requiring issuance of a permit upon a finding of

suitability and a proper reason, Bristol's "policy" governing the issuance of CCW invites a

searching inquiry into myriad factors contemplated neither by the Rhode Island General

Assembly, nor the framers of the Second Amendment:

> 1. Has the applicant demonstrated a specific articulable risk to life, limb or property? If so, has the applicant demonstrated how a pistol permit will decrease the risk?
>
> 2. Can the applicant readily alter his or her conduct, or undertake reasonable measures other than carrying a firearm, to decrease the danger to life, limb or property?
>
> 3. Are there means of protection available to the applicant other than the possession of a firearm that will alleviate the risk to his or her person or property?
>
> 5. Has the applicant presented a plan to properly secure the firearm so that it does not fall into unauthorized hands?
>
> 6. How greatly will the possession of a firearm by the applicant increase the risk of harm to the applicant or to the public?
>
> 7. Has the applicant demonstrated that he or she will not use the firearm for an unlawful or improper purpose, and that he or she has not used a firearm for n (sic) unlawful or improper purpose in the past?

Yet,

> [t]he existence of standards does not in itself preclude a finding of unbridled discretion, for the existence of discretion may turn on the looseness of the standards or the existence of a condition that effectively renders the standards meaningless as to some or all persons subject to the prior restraint.

*Beal* v. *Stern*, 184 F.3d 117, 126 n.6 (2d Cir. 1999).

As the Rhode Island Supreme Court has itself noted "[o]ne does not need to be an expert in American history to understand the fault inherent in a gun-permitting system that would allow a licensing body carte blanche authority to decide who is worthy of carrying a concealed weapon." *Mosby*, 851 A.2d at 1050-51. Bristol's extensive list of 'criteria' demonstrate that carte blanche is exactly the scope of authority it claims. Putting aside, for a moment, that the criteria listed are well beyond the scope of any legislative delegation or charge, they are also irrational. As an initial matter criterion 1 (articulable threat), 2 (measures to alter conduct), 3 (alternate means of protection) are premised on the faulty assumption that a licensing official is capable of predicting whether and the extent to which an applicant will be a victim of a crime. This is pure fantasy. Defendants are plainly incapable of predicting when, where, and how, a particular law abiding citizen will become a victim of violent crime. Defendants cannot predict who will face, much less when or where, a situation in which the right to self-defense would be desperately needed. Crime is largely random and unpredictable. Individuals victimized once may never be victimized again, while an individual's first encounter with a violent criminal often leads to death or seriously bodily harm. The right to self-defense at the Second Amendment's core does not depend for its existence on a history of previous victimization. The Second Amendment provides that individuals, not Defendants, retain the ability to determine whether they wish to carry a gun to protect against "fear [of] an injury to his or her person or property." § 11-47-11(a).

Similarly, the availability of alternative means of protection criterion does not lessen an applicant's claim to the protection of a handgun. The Second Amendment prohibits Bristol from compelling a twenty-two year old co-ed to train for years in the Israeli martial art of Krav-Maga or to walk with her rape whistle at the ready in order to feel safe walking home from her job as a waitress at a local Thames street pub. Criterion number 6 too, is problematic, in that it invites exactly the type of balancing test one might expect the attorney general to use in making a determination under § 11-47-18 but which is forbidden to the licensing authorities under the limited "shall issue" discretion provided by the general assembly. Bristol's "policy" is hardly a model of an appropriate prior restraint, applying "narrow, objective, and definite" standards. The lack of "standards" results in a determination that is entirely arbitrary, subjective, and boundless. Against them stands both a federal and a state constitutional provision guaranteeing individuals the right to carry a gun for self-defense. The desire for self-defense, regardless of Defendants' opinions on the subject, is all the "proper reason" required of Plaintiffs by the Second Amendment.

**4. A Prohibition on Law-Abiding Citizens Carrying Handguns for Self-Defense Without First Demonstrating A Necessity to do so Does Not Survive Any Level of Scrutiny More Demanding Than The Rational Basis Test.**

Even if this court rejects the application of prior restraint doctrine and applies traditional means-end scrutiny, the challenged provision cannot withstand the application of either intermediate or strict scrutiny. While Circuit Courts of Appeal have reasoned that strict scrutiny should apply to regulations that limit "the core right identified in Heller--the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense" those courts have often concluded that intermediate scrutiny should be applied to time place and manner

restrictions on the exercise of second amendment rights the firearms restrictions they have considered. *See, e.g., Chester*, 628 F.3d 673, 683, 685 (4th Cir. 2010) (suggesting that any abridgement of the "core right" would be subject to strict scrutiny but finding the appellant outside the scope of the core right by virtue of his criminal history as a domestic violence misdemeanant). For example, in *United States v. Marzzarella,* 614 F.3d 85 (3d Cir. 2010), the Third Circuit applied intermediate scrutiny to a statute making it unlawful to possess a handgun with an obliterated serial number. *Id.* at 97. The Third Circuit formulated the applicable test as whether the asserted governmental interest was "significant," "substantial," or "important," and whether the fit between the challenged regulation and the asserted objective is "reasonable, not perfect." *Id.* at 97-98. Likewise, in *United States v. Reese,* 627 F.3d 792 (10th Cir. 2010), the Tenth Circuit adopted the Third Circuit's approach in *Marzzarella* and applied intermediate scrutiny to a statute prohibiting the possession of a firearm by a person subject to a domestic protection order. *Id.* at 801-02.

Similarly, in *Masciandaro,* 638 F.3d  458 (4th Cir. 2011), the Fourth Circuit applied intermediate scrutiny to a regulation prohibiting the carrying or possession of a loaded handgun in a motor vehicle inside a national park. *Id.* at 469-70. The Fourth Circuit contemplated that courts "will employ different types of scrutiny in assessing burdens on Second Amendment rights, depending on the character of the Second Amendment question presented." *Id.* at 470. The Fourth Circuit explained that, under such an approach, "we would take into account the nature of a person's Second Amendment interest, the extent to which those interests are burdened by government regulation, and the strength of the government's justifications for the regulation." *Id.* But See *Nordyke v. King,* 644 F.3d 776, 784-85 (9th Cir.2011) (employing a "substantial burden" framework for the analysis of firearm regulations, under which "heightened scrutiny does not

apply unless a regulation substantially burdens the right to keep and to bear arms for self-defense.")

Here, the record is clear that Gendreau is exactly the type of law abiding, responsible citizen who falls within the core of the self-defense right identified in *Heller*. To be sure, strict scrutiny governs analysis of Defendants' licensing scheme. "[C]lassifications affecting fundamental rights are given the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). Moreover, the "proper reason" requirement burdens this "the core right" by completely preventing its very exercise. Accordingly, with regard to application to Gendreau, Bristol should be required to defend its interpretation of the law on strict scrutiny grounds. *Chester*, 628 F.3d at 683, 685  (emphases omitted) (suggesting that any abridgement of the "core right" would be subject to strict scrutiny). However, even if this court applied intermediate scrutiny to Bristol's policy, wherein the defendant "bears the burden of demonstrating (1) that it has an important governmental 'end' or 'interest' and (2) that the end or interest is substantially served by enforcement of the regulation" Gendreau must still prevail. *United States v. Carter*, 669 F.3d 411, 417 (4th Cir. 2012); *see also, Masciandaro*, 638 F.3d at 470, 475 (4th Cir. 2011) (applying intermediate scrutiny to a citizen's claim of right to bear arms in a public park). In applying intermediate scrutiny, Defendant "may not rely upon mere 'anecdote and supposition'" in discharging their burden to show that the claimed ends are substantially served by the "good and substantial reason" requirement. *Carter*, 669 F.3d at 418 (quoting *United States v. Playboy Ent'mt Grp., Inc.*, 529 U.S. 802, 822 (2000)).

The requirement, under an intermediate standard, need not be the "least restrictive means" to pass muster. But it may not "substantially burden more" of the exercise of Second Amendment rights "than is necessary to further the government's legitimate interests" or

"regulate . . . in such a manner that a substantial portion of the burden on [Second Amendment rights] does not serve to advance its goals." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989); *see, e.g.*, *Carter*, 669 F.3d at 418-19. Under this standard, the "degree of fit - between the regulation and the well-established goal of promoting public safety need not be perfect; it must only be substantial." *Heller v. Dist. of Columbia*, 698 F. Supp. 2d 179, 191 (D.D.C. 2010).

Here, Bristol cannot demonstrate any legitimate government interest substantially advanced by the arbitrary issuance of concealed carry permits and it certainly cannot demonstrate that the regulation at issue does not burden substantially more of the exercise of second amendment rights than is needed to advance such an interest. Courts considering analogous need provisions in other state's licensing schemes are split but it is clear that those rejecting the "need" requirement rest on sounder reasoning. Plaintiff has no objection to standards that are actually aimed at ferreting out dangerous and irresponsible people, and which do not trample on rights in the process of so doing. But rationing the right only to those whom the Chief believes are especially deserving violates individual rights without advancing any legitimate government interest.

Though decisions like *Kachalsky* concluded that New York's "proper cause" requirement for a concealed carry permit withstood constitutional scrutiny, it does so only by myopically concentrating on the Supreme Court's pronouncement that the Second Amendment right was at its zenith in the home. 701 F.3d 81 (2d Cir. 2012) The *Kachalsky* court analogized to the invalidity of prohibitions on obscenity and sexual conduct in the home, and applied "substantial deference to the predictive judgments of [the legislature]" (brackets in original) announcing in conclusory fashion that "Restricting handgun possession in public to those who have a reason to

possess the weapon for a lawful purpose is substantially related to New York's interests in public safety and crime prevention."

Yet, less than a month after the Second Circuit issued its opinion in *Kachalsky*, faced with a similar matter, the Seventh Circuit rejected both the reasoning and the conclusions reached by the second circuit. In *Moore v. Madigan* the court was faced with a ban on the public carry of handguns outside the home with the exception of a few broad categories. The court began its analysis by recognizing that

> the implication of the analysis [in heller] that the constitutional right of armed self defense is broader than the right to have a gun in one's home. The first sentence of the *McDonald* opinion states that "two years ago, in *District of Columbia v. Heller*, we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense," *McDonald v. City of Chicago*, *supra*, 130 S. Ct. at 3026. . . .

*Moore v. Madigan*, 702 F. 3d 933, 935 (7th Cir. 2012).

After exploring the historical use of firearms in Illinois, including the public carry and use of such tools by frontiersmen and settlers to defend from attacks by native peoples, the court explained,

> Twenty-first century Illinois has no hostile Indians. But a Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower. A woman who is being stalked or has obtained a protective order against a violent ex-husband is more vulnerable to being attacked while walking to or from her home than when inside. She has a stronger self-defense claim to be allowed to carry a gun in public than the resident of a fancy apartment building (complete with doorman) has a claim to sleep with a loaded gun under her mattress. But Illinois wants to deny the former claim, while compelled by *McDonald* to honor the latter. That creates an arbitrary difference. To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*. It is not a property right—a right to kill a houseguest who in a fit of aesthetic fury tries to slash

> your copy of Norman Rockwell's painting *Santa with Elves*. That is not self-defense, and this case like *Heller* and *McDonald* is just about self-defense.

Id. at 937.

Though recognizing that "A gun is a potential danger to more people if carried in public than just kept in the home" the court also recognized that "the other side of this coin is that knowing that many law-abiding citizens are walking the streets armed may make criminals timid." *Id*. "Given that in Chicago, at least, most murders occur outside the home" the court noted that "the net effect on crime rates in general and murder rates in particular of allowing the carriage of guns in public is uncertain both as a matter of theory and empirically." The Seventh Circuit panel then proceeded to review and discuss a number of scientific studies on the impact of the Illinois ban on crime rates before concluding that "In sum, the empirical literature on the effects of allowing the carriage of guns in public fails to establish a pragmatic defense of the Illinois law." *Id*. at 939. Notably the court observed

> Anyway the Supreme Court made clear in Heller that it wasn't going to make the right to bear arms depend on casualty counts. If the mere possibility that allowing guns to be carried in public would increase the crime or death rates sufficed to justify a ban, Heller would have been decided the other way, for that possibility was as great in the District of Columbia as it is in Illinois.

*Id*.

Though the court failed to expressly engage in an analysis based on degrees of scrutiny, analogizing to its prior decision in *United States v. Skoien*, 614 F.3d 638, 643–44 (7th Cir. 2010) (en banc), the court noted that in that case, when presented with a challenge to the federal gun law, 18 U.S.C. § 922(g)(9), prohibiting anyone "who has been convicted in any court of a misdemeanor crime of domestic violence" to possess a firearm in or affecting interstate

commerce it had required the government to make "'a strong showing' that a gun ban was vital

to the public safety" *Id*. at 14. Because Illinois could not make that showing the Court found that

the wide sweeping ban was unconstitutional.

As explained above, Defendants' whims and personal opinions as to who should enjoy

Second Amendment rights impermissibly classifies individuals in the exercise of these rights in a

completely arbitrary, standardless fashion. Though the "policy" purports to contain standards, in

reality those standards are so broad and vague as to vest unbridled discretion in the Licensing

Authority. For example, when, during the interview process, Gendreau explained that part of his

rationale for seeking a Rhode Island permit was that possession of a Rhode Island permit was a

prerequisite for issuance of a Massachusetts permit, which he hoped to seek in order to increase

his employment opportunities, A member of the Board indicated "That's interesting because

most, I would say this heavily weighs on need and if you have a need in Massachusetts and not a

need  in Rhode Island how can they make you get one?" TR. at 9-11. In reading the whole

transcript it becomes clear that the board viewed the desire to obtain employment in

Massachusetts as going to "a proper showing of need" in Massachusetts but not Rhode Island.

This is despite the fact that a Rhode Island permit is a prerequisite to the issuance of a

Massachusetts non-resident permit. If one accepts that enhanced employment opportunities are a

proper reason for issuance of a permit – a recognition made by the Rhode Island Supreme Court

in *Gadomski* - there is no reason why the geographical location of those opportunities is relevant

to the determination. Particularly, when the permit is a necessary predicate. Thus the "proper

reason" requirement, as applied by Bristol contrary to the interpretation adopted by the Rhode

Island Supreme Court, is far to overbroad. Nothing in a "proper reason" requirement that allows

for unbridled discretion serves to rationally further the end of public safety without completely

trouncing the core right of self-defense. This becomes all the more clear when one considers how legitimate restrictions are already served by other aspects of the Rhode Island or federal law. For example 18 U.S.C. § 922(g) already ensures that guns are kept out of the hands of those adjudged most likely to misuse them, such as criminals or the mentally ill. Rhode Island already attempts to reduce accidents by imposing a requirement that permit applicants complete a training and marksmanship requirement. R.I. Gen. Laws § 11-47-15. Likewise the proper reason element does not ensure the suitability of an applicant as that is a separate element in the statute. Rather, the ability to arbitrarily decide who is entitled to exercise his or her Second Amendment rights compels the conclusion that any ends reached by the regulation are so divorced from the states legitimate interest in public safety as to fail the substantially related and overburdening prongs of intermediate scrutiny. Furthermore there is no legitimate state interest in depriving people of the means of self-defense. The state may have an interest in reducing gun violence and accidents, but it cannot presume that the exercise of a constitutional right will cause the sort of harm it is allowed to curtail. Defendants cannot point to the impact of their practice – the deprivation of constitutional rights – as their interest. *Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.*, 502 U.S. 105, 120 (1991). McDonald's instructions bear repeating:

> [T]here is intense disagreement on the question whether the private possession of guns in the home increases or decreases gun deaths and injuries. The right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category.

*McDonald*, 130 S. Ct. at 3045 (citations omitted).

Nor is the arbitrary licensing practice narrowly or substantially tailored to any interest in public safety. For example, the 'proper reason' requirement, as applied by Bristol, does not, for

advance the interests of public safety by keeping guns out of the hands of those most likely to

misuse them, such as criminals or the mentally ill, nor does it not ban handguns from particularly

sensitive places where the possibility of mayhem is most acute. Where other jurisdictions have

enacted measures with large gulfs between the interests advanced and the infraction on

individual's carry rights, other courts have acted to protect the individual's rights to self-defense.

Striking down North Carolina's prohibitions on carrying handguns during "states of

emergency," the court in *Bateman v. Perdue* found that such laws

> do not target dangerous individuals or dangerous conduct. Nor do
> they seek to impose reasonable time, place and manner restrictions
> by, for example, imposing a curfew to allow the exercise of Second
> Amendment rights during circumscribed times. Rather, the statutes
> here excessively intrude upon plaintiffs' Second Amendment rights
> by effectively banning them (and the public at large) from
> engaging in conduct that is at the very core of the Second
> Amendment at a time when the need for self-defense may be at its
> very greatest . . . .

*Bateman*, 2012 U.S. Dist. LEXIS 47336 at *17-*18 (citation omitted). Likewise, Massachusetts'

statute disarming legal aliens failed intermediate scrutiny, as it

> fail[ed] to distinguish between dangerous non-citizens and those
> non-citizens who would pose no particular threat if allowed to
> possess handguns . . . Any classification based on the assumption
> that lawful permanent residents are categorically dangerous and
> that all American citizens by contrast are trustworthy lacks even a
> reasonable basis.

*Fletcher v. Haas*, No. 11-10644-DPW, 2012 U.S. Dist. LEXIS 44623, at *46-*47 (D. Mass. Mar.

30, 2012).

Finally, even if the right at issue—the ability to carry arms for self-defense—could

somehow constitute an evil that Defendants are entitled to address, less-restrictive alternatives

are plainly available to Defendants. Statues or regulations that require officials to issue gun carry

licenses to applicants who meet non-discretionary standards can and often are enacted. In some states, a license is required only if a gun is carried concealed. Others, do not require permits to carry handguns at all although, they issue permits for reciprocity purposes. See ARS § 13-3112. Yet another Wisconsin – prohibits concealed carry, but allows citizens to carry exposed handguns without a license. Wis. Stat. Ann. § 941.23.

Defendants already conduct background checks on permit applicants, require applicants to complete approved training, and remain free to ban guns from being carried in sensitive places or in a dangerous manner. Defendants have many narrowly-tailored tools at their disposal for addressing compelling public safety interests in the regulation of firearms without arbitrarily depriving individuals of their fundamental rights. The practice thus fails all aspects intermediate and strict scrutiny analysis.

## CONCLUSION

This record presents nothing to suggest that Petitioner is unsuitable or seeks a permit for an improper purpose and there is ample evidence demonstrating that he satisfies those constitutional requirements. Geandreau is a firearms collector, needs a firearm for self-defense, and to advance his career prospects. There is nothing in the record to indicate that Gendreau's professed reasons for seeking a permit are not credible. Rhode Island law clearly recognizes gun collecting as a proper reason for seeking a permit, and no lesser an authority than the United States Supreme Court has declared that the core of the Second Amendment right is self-defense. Defendants' arbitrary denial of Plaintiff's Rhode Island statutory and constitutional rights, and of Plaintiff's Second Amendment right must be enjoined.  This Honorable Court should grant the Plaintiff's Motion for Summary Judgment and grant Plaintiff the legal and equitable remedies he seeks.

Dated: 1/4/2015

Plaintiff, Jarren Ray Gendreau,
By and through his Attorney,

/s/Matthew L. Fabisch

_____

Matthew L. Fabisch (R.I. Fed. Bar # 8017)
664 Pearl Street
Brockton, MA 02301
(Tel) 401-324-9344
(Fax) 401-354-7883
Email: Fabisch@Fabischlaw.com