UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JARREN GENDREAU                                :
                                               :
     vs.                                       :    Case No. 1:14-cv-00337
                                               :
JOSUE D. CANARIO,                              :
In his capacity as Chief of Police of          :
the Bristol Police Department; and the         :
Town of Bristol, Rhode Island                  :
                                               :

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS**

In accordance with Local Rule Civ 56(a)(2), Plaintiff Jarren Gendreau respectfully submits this Statement of Undisputed Facts in support of his Motion for Summary Judgment.

1. Plaintiff Jarren Gendreau ("Gendreau" or "Plaintiff") is a natural person and a citizen of the United States and of the State of Rhode Island and Providence Plantations ("Rhode Island"), residing in Bristol, Rhode Island. (Admitted in Def.'s Ans. ¶ 1).

2. Defendant Town of Bristol, Rhode Island,is a duly chartered municipality organized under the laws of the State of Rhode Island. (Admitted in Def.'s Ans. ¶ 2).

3. Defendant Josue D. Canario ("Chief Canario"), is the Chief of Police of the Town of Bristol, Rhode Island. (Admitted in Def.'s Ans. ¶ 3).

4. Defendant Josue D. Canario, in his capacity as Chief of Police of the Bristol Police Department is the licensing authority for the Town of Bristol, Rhode Island. (Admitted in Def.'s Ans. ¶ 17).

5. Bristol has developed a policy to guide the processing of concealed carry permit applications. (Admitted in Def.'s Ans. ¶ 20) (Ex. 1.)

6. Under the policy, after receiving a completed application, along with a non-refundable payment of $100.00 the Bristol Police Department conducts a background check that "may include a check of court records and other sources for pending criminal cases, restraining orders and/or discrepancies in the applicant's background, including prior history or mental illness." (Admitted in Def.'s Ans. ¶ 21)

7. According to the Policy "[t]he Town of Bristol will not issue a pistol permit to any applicant who is prohibited from possessing or carrying a firearm under any State of Federal Law (e.g (sic) 18 U.S. (sic) 922(g)) or pursuant to any court order." (Admitted in Def.'s Ans. ¶ 22)

8. According to the Policy, after the background check is done, the Chief proceeds to consider a showing of need. "If this initial check does not disqualify the applicant from obtaining a pistol permit, the Town of Bristol shall review the application on an individual basis to determine whether there has been proper showing of need, as required by the statute, and whether the applicant is qualified." (Admitted in Def.'s Ans. ¶ 23)

9. The Policy, in a section captioned "Proper Showing of Need" first explains the approach taken to making a determination:

> In considering each individual application for a pistol permit, the Town of Bristol must determine whether or not the applicant has demonstrated a proper showing of need to carry a loaded firearm in public, and consider the individual's demonstration of skill and responsibility to safely carry and use a firearm in compliance with all State, Federal and local laws. Because a loaded, concealed firearm in untrained hands presents danger to the public and the applicant, the Town of Bristol must consider countervailing risks to the public in assessing need.

(Admitted in Def.'s Ans. ¶ 24)

10. The policy then goes on to set out the "factors" considered in making the determination:

> While there cannot be any set formula or criteria to limit or restrict the Town of Bristol's discretion to issue or deny a concealed weapon license, the Town will afford a hearing to each applicant before ruling

on the application. The Town of Bristol considers the following factors in assessing an applicant's proper showing of need.

1. Has the applicant demonstrated a specific articulable risk to life, limb or property? If so, has the applicant demonstrated how a pistol permit will decrease the risk?

2. Can the applicant readily alter his or her conduct, or undertake reasonable measures other than carrying a firearm, to decrease the danger to life, limb or property?

3. Are there means of protection available to the applicant other than the possession of a firearm that will alleviate the risk to his or her person or property?

4. Has the applicant demonstrated the skill, training and ability to properly use a firearm in accordance with Rhode Island laws?

5. Has the applicant presented a plan to properly secure the firearm so that it does not fall into unauthorized hands?

6. How greatly will the possession of a firearm by the applicant increase the risk of harm to the applicant or to the public?

7. Has the applicant demonstrated that he or she will not use the firearm for an unlawful or improper purpose, and that he or she has not used a firearm forn (sic) unlawful or improper purpose in the past?

8. Does past unlawful, dangerous or violent conduct of the applicant justify denial of the license by the Town even if it is not sufficient to disqualify the applicant as a matter of law from possessing a firearm?

9. Has a protective order been issued relative to the applicant pursuant to chapter 15-5, chapter 15-15, or chapter 8-8.1 of the general laws?

10. Are other factors deemed lawful and appropriate by the Town to demonstrate that the applicant is or is not a person suitable topossess a firearm in public.

(Admitted in Def.'s Ans. ¶ 25)

11. According to the policy, "[a]fter assessing the above factors, the Town shall grant or deny the concealed weapon permit, and in the case of a denial, shall state its reasons therefore in writing." (Admitted in Def.'s Ans. ¶ 26)

12. Gendreau followed the process laid out in the Bristol Policy and applied for a Concealed Carry Permit in the spring of 2012. See *Application of Jarren Gendreau for a Concealed Carry Permit*, Ex. 2, Ap. 12 (Admitted in Def.'s Ans. ¶ 27)

13. In his Application, Gendreau explained that he was seeking a permit for three reasons. First, Gendreau explained that he is a firearms collector with a collection, at the time, worth in excess of $4,000. Next Gendreau explained that he was employed as a security guard and was seeking expanded employment opportunities that only a concealed weapons permit (CCW) could provide, including those in Massachusetts which would require a further application and permit as well. Finally, Gendreau explained that he often transports large sums of money, and that he needs a CCW for personal protection and self-defense. See Ex. C 1-9. (Admitted in Def.'s Ans. ¶ 28).

14. In early May, Gendreau participated in an "interview" with a board appointed by the Chief of Police to conduct the hearing called for by the Town's Policy. (Admitted in Def.'s Ans. ¶ 29)

15. During the hearing Gendreau was asked about his reasons for desiring a permit and reiterated those reasons contained in his letter. Pl.'s Compl. Ex 2; *Tr. of Interview*, Ex. 3, Ap. 19-27, 19. Of particular focus was Gendreau's desire to obtain a Massachusetts permit, leading to the following colloquy:

> BOARD MEMBER 2: If they were to hire you in Massachusetts, for this position, that requires you to have a firearm and your a Rhode Island resident. Are they going to tell you, we're not going to hire you because you have to have a firearm, a concealed weapons permit but you first have to go get one from Rhode Island. I . . . does, when he said does it get around the issue?

> MR. GENDREAU: No, like I said, I after I apply to this I'm going to apply to the Massachusetts State Police, who issues their out of state, non-resident concealed to carry permits for class A LTCs as they call it there its not truly concealed carry.
> BOARD MEMBER 2: Are you saying Massachusetts, Massachusetts will not issue a permit to a non resident . . .
> MR. GENDREAU: Unless they have it in their home state.
> BOARD MEMBER2: Even if you get hired?
> MR. GENDREAU: Even if you get hired, you must have it in your home state. yep that's necessary, mandatory, no ifs, ands or buts.
> BOARD MEMBER 2: (unintelligible) . . . ask the question.
> MR. GENDREAU: I'm sorry yeah.
> BOARD MEMBER 2: That's interesting because most, I would say this heavily weighs on need and if you have a need in Massachusetts and not a need in Rhode Island how can they make you get one?
> MR. GENDREAU: Well it doesn't really weigh on need in Rhode Island forthe town anyway, I believe it's 11-47-11 it doesn't say a showing of need, its says has a reason to believe they will, could be under great bodily harm which, for the reasons listed, I think its fair to say I fare reason to believe that during such activities I run the risk great bodily harm and then its a shall issue.
> BOARD MEMBER 2: OK and you never read proper showing of need under that?
> MR. GENDREAU: That is under the AG which you guys are not, you are the town official which is 11-47-11. I'm pretty sure. I think your. . .
>                                      \* \* \*

(Admitted in Def.'s Ans. ¶ 31).

16. After also focusing on the desire for expanded employment opportunities and a Massachusetts permit, another member asked for "an example when you would draw, draw a weapon?" to which Gendreau responded:

> Well do you want to give me a scenario or just an example. Well, I'd never draw a weapon unless one, I can't retreat; two I feel my life is threatened and in immediate physical harm and three, the fear I'm going to be killed. There is no other reason to draw a weapon, no brandishing, its all bad, unless you can't run and you fear for you life and that your going to die. There is no point to even drawing it besides under those situations.

(Admitted in Def.'s Ans. ¶ 32).

17. At no other time during the interview did anyone on the Board ever pose a question going to Gendreau's suitability. See Pl.'s Compl. Ex. 3 p. 1-9.

18. Gendreau has never been arrested, never been confined or treated for mental health, and never been indicted or charged with a criminal violation. He had pled nolo contendre to a speeding violation in 2009. See Pl.'s Compl. Ex. 2.

19. Gendreau is over the age of 21. See Pl.'s Compl. Ex. 2.

20. Neither of Chief Canario's letters denying Plaintiff's permit application, finds that he is unsuitable under Gen. Laws § 11-47-11(a).  See Pl.'s Compl. Ex. D, Ex. F.

21. Both of Chief Canario's letters, denying Plaintiff's permit application, fail to address several of his reasons for seeking a permit to carry a pistol or revolver including, self-defense and his status as a firearms collector. See Pl.'s Compl. Ex. D, Ex. F.

22. Chief Canario's second letter also fails to specifically address Plaintiff's desire to obtain a permit in order to secure greater employment opportunities.  See Pl.'s Compl. Ex. F.

23. On June 26, 2012, the Chief sent a short two paragraph letter to the Petitioner stating in pertinent part:

> After carefully reviewing the application and receiving a recommendation from the panel which interviewed you with regards to your application for a concealed weapon permit, it is with regret that I advise you that I feel that you do not meet the criteria outlined in 11-47-11 of the General Laws of Rhode Island as amended, as well as Bristol Police Department's Guidelines which would justify me issuing you a concealed weapons permit.

See Pl.'s Compl. Ex. D (Admitted in Def.'s Ans. ¶ 35).

24. On or about February 25, 2013 plaintiff Gendreau filed a Petition for Certiorari with the Rhode Island Supreme Court seeking review of the decision denying his concealed carry permit application arguing, inter alia, that the decision denying the application was insufficiently detailed, and that it violated the petitioner's constitutional and statutory rights under the laws of the United States and the State of Rhode island. (Admitted in Def.'s Ans. ¶ 36).

25. On September 18, 2013, the Rhode Island Supreme Court granted the plaintiff's petition for certiorari and quashed the original decision denying the plaintiff's concealed carry permit application. (Admitted in Def.'s Ans. ¶ 37).

26. The order of the Rhode Island supreme court, allowed the defendants ninety days within which to render a new decision. The decision also granted the plaintiff leave to amend his petition for certiorari to include any disputes with the new decision without the need to file an additional petition for review or incur the cost of a filing fee for the new petition, if filed within thirty days of the new decision. See Compl. Ex. E. (Admitted in Def.'s Ans. ¶ 38).

27. After its decision was quashed, the defendants rendered a new decision again denying the plaintiff's application. See Compl. Ex. F. (Admitted in Def.'s Ans. ¶ 39).

28. Though dated October 16, 2013, the second letter was not actually sent to Plaintiff's counsel until November 21, more than 30 days after it was rendered. See Pl.'s Compl. Ex. F.

**Dated: 1/4/2015**                                **Plaintiff, Jarren Ray Gendreau,**
                                                   **By and through his Attorney,**

                                                   **/s/Matthew L. Fabisch**
                                                   _____
                                                   **Matthew L. Fabisch (R.I. Fed. Bar # 8017)**
                                                   **664 Pearl Street**
                                                   **Brockton, MA 02301**
                                                   **(Tel) 401-324-9344**
                                                   **(Fax) 401-354-7883**
                                                   **Email: Fabisch@Fabischlaw.com**